855 F.2d 1499
 129 L.R.R.M. (BNA) 2531, 110 Lab.Cas. P 10,781,
10 Employee Benefits Ca 1265
 UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC; Joseph D.
Forest; Henry Roberson, A.C. Burttram, Jr., for
themselves and all persons similarly
situated,
Plaintiffs-Appellees-
Cross-Appellants,
v.
CONNORS STEEL COMPANY, a corporation, Defendant,
H.K. Porter Company, Inc., a corporation,
Defendant-Appellant-Cross-Appellee.
 No. 87-7418.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 28, 1988.
Rehearing and Rehearing En Banc Denied Oct. 31, 1988.
 
 Harry L. Hopkins, Lange, Simpson, Robinson & Somerville, Duncan B. Blair, Birmingham, Ala., for defendant-appellant-cross-appellee.
 Jerome A. Cooper, Cooper, Mitch, Crawford & Kuykendall, Jay Smith, William T. Payne, Birmingham, Ala., for United Steelworkers of America, AFL-CIO-CLC, and Joseph D. Forest, Henry Roberson, A.C. Burttram, Jr. etc.
 Appeal from the United States District Court for the Northern District of Alabama.
 ON PETITION FOR REHEARING
 (Opinion June 16, 1988, 11 Cir., 847 F.2d 707).
 Before VANCE and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 
 1
 The panel has decided to vacate its earlier opinion and judgment in this case, United Steelworkers of America v. Connors Steel, 847 F.2d 707 (11th Cir.1988), and to substitute the following in its stead.
 
 
 2
 This is an appeal from a judgment of the trial court enjoining H.K. Porter Company from failing to continue payment of health and life insurance benefits to employees of Connors Steel Company, Porter's wholly owned subsidiary, after the class action against Connors had been stayed by the bankruptcy of Connors.
 
 I. STATEMENT OF THE CASE
 
 3
 Plaintiffs are the United Steelworkers of America, AFL-CIO-CLC (the "Steelworkers"), and certain former hourly employees (including surviving spouses) of Connors Steel Company. Plaintiffs brought this action under Sec. 301 of the Labor Management Relations Act (the "Labor Act"), 29 U.S.C. Sec. 185(a), and Sec. 502(a) of ERISA, 29 U.S.C. Sec. 1132(a). Until February 28, 1987, the individual plaintiffs received life and health insurance benefits from Connors under the "1980 Pensioners Agreement" and the "1980 General Insurance Agreement" (collectively, the "1980 Insurance Agreements").
 
 
 4
 Plaintiffs filed their complaint on March 6, 1987. Plaintiffs also filed a motion for preliminary injunction and a motion to maintain the lawsuit as a class action.
 
 
 5
 On March 22, 1987, Connors filed for relief under Chapter 7 of the Bankruptcy Code. On April 3, 1987, the district court confirmed that this action was stayed as to Connors.
 
 
 6
 On March 24, 1987, the court held a hearing on plaintiffs' motion for class certification and motion for preliminary injunction. The court rendered its decision on April 3, 1987, granting both of plaintiffs' motions.
 
 
 7
 On April 20, 1987, H.K. Porter filed a motion to strike the jury demand in plaintiffs' complaint. The court granted that motion on May 11, 1987. On April 20, 1987, H.K. Porter also filed a motion for summary judgment to strike claims for extra-contractual compensatory and punitive damages.
 
 
 8
 On May 20, 1987, the court conducted a non-jury trial on the question whether H.K. Porter was liable to provide health and life insurance benefits to plaintiffs. On June 11, 1987, the court entered an order and memorandum opinion making the preliminary injunction against H.K. Porter permanent and granting H.K. Porter's motion for summary judgment "to the extent of dismissing all non-ERISA claims with prejudice." The court also "reconfirmed" its earlier findings and conclusions and struck plaintiffs' jury demand.
 
 
 9
 This appeal followed.
 
 II. STATEMENT OF THE FACTS
 
 10
 A. As to the obligation of Connors to continued payments.
 
 
 11
 The material facts in this case occurred over approximately 25 years. They encompass the history of the operation by H.K. Porter of the Connors Steel Division of H.K. Porter Company and the operation of the later incorporated Connors Steel Company, and its relation to H.K. Porter, its sole owner, to the date of the bankruptcy of Connors in 1987.
 
 
 12
 In 1950, H.K. Porter acquired a steel making facility in Birmingham, Alabama called Connors Steel Company. H.K. Porter operated the plant as the Connors Steel Division of H.K. Porter Company. In 1956, H.K. Porter acquired another steel making facility in Huntington, West Virginia, and operated it as the West Virginia Works of the Connors Steel Division of H.K. Porter Company. H.K. Porter operated Connors Steel Company in this manner until 1974.
 
 
 13
 On March 22, 1974, H.K. Porter incorporated Connors as a separate subsidiary. H.K. Porter took this step, among other things, to limit its liability.
 
 
 14
 Beginning in 1974, the Steelworkers and Connors negotiated what was known as a "basic agreement" and a "general insurance agreement" and a "pensioner's agreement" (hereinafter collectively "the insurance agreements"). Each of these agreements ran for a term of years and was renegotiated in 1980. They were all negotiated with an employee of Connors, not of H.K. Porter. The agreements negotiated in 1980, which had an effective date of January 1, 1981, are those which are before the court for construction in this case. During its term, Connors suffered severe financial loss and several concessions were allowed by the Steelworkers and some others were denied by the Steelworkers. Finally, as the time for expiration of the 1980 agreement approached, Connors started to negotiate with the Steelworkers for a new contract. However, the negotiations came to an impasse. No new contract was agreed to.
 
 
 15
 Thereupon, Connors notified the retirees that their health and life insurance benefits would cease on September 31, 1983, the date of the expiration of the "basic agreement." Nevertheless, Connors continued to fund both the health and life benefits for plaintiffs' class with funds supplied by H.K. Porter for nearly four years. This was done on the advice of Porter's general counsel and vice president Moncrief.
 
 
 16
 In 1987, Porter found an increase in the costs of such funding unacceptable, and unilaterally stopped the benefits. This action then ensued. A few days later, Porter placed Connors under the protection of the bankruptcy court under Chapter 7.
 
 
 17
 There is no dispute between the parties as to the benefits granted to retirees under the 1980 agreement. The only question is whether such benefits were to be continued after the expiration of the underlying negotiated agreement. Included in the provisions of the health insurance agreement appears the following:
 
 
 18
 Continuation of Coverage.
 
 
 19
 6. Any pensioner or individual receiving a surviving spouse's benefit who shall become covered by the program established by this agreement shall not have such coverage terminated or reduced (except as provided in this program) so long as the individual remains retired from the company or receives a surviving spouse's benefit, notwithstanding the expiration of this agreement, except as the company and the union may agree otherwise.
 
 
 20
 (Emphasis added.)
 
 
 21
 The insurance agreement provided as follows:
 
 Life Insurance After Retirement
 
 22
 8. Any employee who shall have retired and who shall have become entitled to basic life insurance after retirement pursuant to the provisions of the insurance agreement and booklet applicable to such employee at the time of retirement shall not have such basic life insurance terminated or reduced (except as provided in such booklet) so long as he or she remains retired from the company, notwithstanding the expiration of such agreement or booklet of this agreement, except as the company and the union may agree otherwise.
 
 
 23
 (Emphasis added.)
 
 
 24
 Appellant does not contend that the company and the union ever "agreed otherwise" that either of these coverages could be terminated or reduced.
 
 
 25
 In support of its contention that the health insurance and life insurance provided to retirees under the terms of the 1980 "basic agreement" were no longer effective after the expiration of the collective bargaining agreement it is necessary to consider the following provision in Section 20 of the 1980 basic agreement:
 
 
 26
 Except as otherwise provided below, this Agreement shall terminate (sic) the expiration of sixty days after either party shall give written notice of termination to the other party but in any event shall not terminate earlier than September 1, 1983.
 
 
 27
 If either party gives such notice it may include notice of its desire to negotiate with respect to insurance, pensions, the savings and vacation plan, and supplemental employment benefits (existing provisions or agreements as to insurance, pensions, the savings and vacation plan, and supplemental unemployment benefits to the contrary notwithstanding ), and the parties shall meet within thirty days thereafter to negotiate with respect to such matters by the end of sixty days after the giving of such notice, either party may therafter resort to strike or lock-out as the case may be in support of its position in respect to such matters as well as any other matters in dispute (the existing agreements, or provisions with respect to insurance, pensions, savings and vacation plan, and supplemental unemployment benefits to the contrary notwithstanding ).
 
 
 28
 (Emphasis added).
 
 
 29
 B. The facts as to the obligation of H.K. Porter Company to carry out the agreements made by Connors.
 
 
 30
 The trial court under its heading "Findings of Fact" in its memorandum order supporting its preliminary injunction stated:
 
 
 31
 1. Petitioners have made a strong showing that they are likely to prevail on the merits. The evidence, while conflicting in certain important respects, particularly as to plaintiffs' alter ego theory, is clear that H.K. Porter Company continued to fund the hospital and medical benefits obligations of its wholly owned subsidiary, Connors Steel Company, long after Connors Steel Company was no longer an operating company and after Connors Steel Company was, by any reasonable definition of "insolvency", "insolvent". It is difficult to explain such sizable expenditures by a non-eleemosynary, stockholder-owned institution without there being a sense of legal obligation to make those expenditures. The payments may be explained by the language of the plans themselves, which must be construed in favor of its beneficiaries and which, reasonably construed, hold out to pre-1983 retirees and their survivors continued medical and life insurance benefits, even after the termination of the collective bargaining agreement which existed when the plans were last adopted.
 
 
 32
 * * *
 
 
 33
 Plaintiffs may have failed to prove by a preponderance of the evidence, properly analyzed, the entire laundry list of twelve factors to be used in determining whether or not a parent corporation is the alter ego of its subsidiary. This list is outlined in United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691 (5th Cir.1985). Of course, it is not necessary that plaintiffs prove the existence of all twelve factors. The Fifth Circuit did not weight the twelve factors in their order of significance. The court finds that enough of these factors do exist, without taking the time to mention each one, to indicate the necessary degree of control by H.K. Porter Company over Connors Steel Company to constitute an alter ego relationship in this case.
 
 
 34
 Mem.Op. No. 87-AR-0374-S (M.D.Ala. Apr. 3, 1987).
 
 
 35
 The trial court in making further findings of fact in the hearing for permanent injunction stated:
 
 
 36
 The single most telling new evidence presented during the recent hearing on the issue of permanent injunctive relief, and on all other issues involving the liability of H.K. Porter to members of the plaintiff class, came from H.K. Porter's vice-president, general counsel and member of its management committee, Lawrence E. Moncrief, who testified that it was he who incorporated Connors Steel Company in 1974 for the purpose of limiting the liability of H.K. Porter (Connors' sole shareholder), but that when the Birmingham plant of Connors closed in 1983 and terminated all of its operating employees he advised H.K. Porter that it should continue to fund the insurance obligations or benefits here in dispute.... It was not until insurance costs began to escalate that Mr. Moncrief went along with management's idea of Connors' filing for bankruptcy and H.K. Porter's contemporaneously discontinuing the insurance benefits for Connors' former employees. Neither Mr. Moncrief, as a corporate officer, nor H.K. Porter itself, was motivated in 1983, 1984, 1985 or 1986 by pure, unadulterated altruism. Corporate generosity begins at home, namely with the stockholders. Yet, H.K. Porter continued the benefits after the 1983 closing until January, 1987.... The court agrees with the legal opinion which Mr. Moncrief reached in 1983 and finds no reason to quarrel with that opinion simply because of H.K. Porter's unfavorable insurance cost experience in 1986.
 
 
 37
 The degree of Connors' autonomy from H.K. Porter was very questionable under the evidence received at the hearing which led to the preliminary injunction of April 3, 1987. Any lingering doubt on this subject has now been removed, and the court finds that insufficient Connors autonomy existed to insulate H.K. Porter from Connors' contractual obligations to its retired employees under this particular collective bargaining agreement and the collateral insurance agreements.
 
 
 38
 The modus operandi, except for occasional corporate minutes, did not really change when Connors was incorporated in 1974. The basic difference, which the court does not find decisive, is that collective bargaining agreements thereafter were negotiated between the Steelworkers and Connors instead of between the Steelworkers and H.K. Porter. Prior to 1974, Connors, then a division of H.K. Porter, already had its separate management, its separate accounting personnel, its separate bank account, and other areas of separation. If H.K. Porter was "in charge" of Connors before 1974, it was just as much "in charge" after 1974, except for certain corporate formalities observed by Connors. Connors certainly knew both before and after 1974 who and where the "boss" was. For instance, Keith Garrity, president of H.K. Porter, hired a consulting firm to do an expensive study of Connors and charged the study to Connors without ever consulting Connors.
 
 
 39
 * * *
 
 
 40
 A one-stockholder annual meeting by Connors does not provide an absolute defense to plaintiffs' alter ego theory. Corporate niceties, even if observed, do not prove the lack of control necessary to establish real autonomy.
 
 
 41
 Another fact clearly appearing for the first time at the recent hearing is the looseness of the handling of H.K. Porter's "loans" to Connors. Although by the terms of the various notes from Connors to H.K. Porter, interest was required to be paid, interest rarely, if ever, was paid. This may be explained by Connors' poor performance, but it also indicates the high degree of control which the parent corporation had over the subsidiary. Obviously, the "shots were called" in Pittsburgh.
 
 
 42
 * * *
 
 
 43
 H.K. Porter allowed Connors to enter into a collective bargaining agreement which, without this court's attempting to analyze its language, obligated Connors beyond the life of the agreement and for the lives of the retired employees. In allowing this agreement to be negotiated, H.K. Porter may have exercised faulty business judgment, but this court is not here being asked to rescue a corporation from its entrepreneurial mistake.
 
 
 44
 C. Facts as to ERISA violation.
 
 
 45
 The trial court found that H.K. Porter was the "plan administrator" as defined in ERISA, stating:
 
 
 46
 Not only did H.K. Porter actually designate itself as the "plan administrator," in official forms filed with the appropriate governmental authorities, but Mr. Moncrief, in effect, conceded on the witness stand that H.K. Porter was the "plan administrator" after Connors ceased operations. Whatever obligation attaches to a "plan administrator" under ERISA by virtue of holding that office attached to H.K. Porter after Connors closed its Birmingham plant....
 
 
 47
 ... In this case H.K. Porter was and is both the "sponsor" and the "administrator." Its fiduciary obligation to plaintiffs was and is to honor the obligations which H.K. Porter assumed in fact and by operation of law when Connors ceased operations. The insurance rights of Connors retirees and their survivors vested upon retirement (as witnessed by their continued payment, while Connors' terminated employees received no such benefits)....
 
 III. DISCUSSION
 
 48
 A. Connors' liability for continuing insurance benefits
 
 
 49
 Appellant's argument overlooks the distinction between the right of the Steelworkers and the plaintiff class to have Connors continue to provide insurance benefits after the expiration of the basic agreement that, under the agreement, they had already contracted to provide for the retirees and the right of Connors to bargain over any new obligation differing from the basic agreement following its expiration.
 
 
 50
 It is difficult to construe the language of the insurance agreements in any manner other than as contended for by the plaintiffs. This language, as noted above, states that any individuals receiving benefits provided under the insurance agreements "shall not have such coverage terminated or reduced so long as the individual remains retired from the company or receives a surviving spouse's benefits, notwithstanding the expiration of this [basic] agreement." We consider this language to be unambiguous. It in no way conflicts with Article 20 of the basic agreement, which merely provides, in effect, that the benefits to be accorded thereafter are subject to bargaining. This view is fully supported by the decided cases, UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984); Weimer v. Kurz-Kasch, 773 F.2d 669 (6th Cir.1985). In neither of these cases was there a provision that benefits would not be terminated upon the expiration of the collective bargaining agreement. The court nevertheless held in each case that the intent of the parties was clear: they intended for the benefits to continue beyond the expiration date of the negotiated contract. In Yard-Man, the language of the contract was as follows: "When the former employee has attained the age of 65 years then: (1) the company will provide insurance benefits equal to the active group benefits ... for the former employee and his spouse."
 
 
 51
 The court held this provision ambiguous, because nothing within the particular language expressly stated what the benefits were for active employees. The court thereupon considered other language of the contract, and concluded that express use of durational language dealing with other benefits clearly implied that no such durational intent could be found here. The court construed the entire contract as resolving the ambiguity in favor of the retirees. The court said:
 
 
 52
 Yard-Man urges that a general durational clause which provided that the collective bargaining agreement should remain in force until June 1, 1977 demonstrates an intent that all benefits described in the agreement also terminate at that date. We do not agree. The clause did not specifically refer to the duration of benefits. The persuasive considerations we have discussed demonstrate that retiree benefits were intended to outlive the collective bargaining agreement's life and outweigh any contrary implications derived from a routine duration clause terminating the agreement generally. Such an intent takes precedence over a non-specific general clause.
 
 
 53
 716 F.2d at 1482.
 
 
 54
 In Weimer v. Kurz-Kasch, Inc., supra, the contract before the court contained the following language:
 
 
 55
 "The company shall pay the cost ... [of the designated benefits] as long as such employee remains retired and unemployed, either by the company or by anyone else." The court then stated: "This court held in Yard-Man that a general duration or termination clause ending the collective bargaining agreement as of a certain date did not demonstrate an intent that all benefits described in the agreement terminate as of that date. 716 F.2d at 1482-83. See also Bower v. Bunker Hill, 725 F.2d 1221, 1223 (9th Cir.1984) (stating that a retirement medical insurance plan, which lacked an explicit expiration date, was not necessarily bound by the expiration date of the labor management agreement). In light of the insurance provisions conditioning the grant of retiree insurance benefits only on the retirees remaining retired and unemployed, and in light of the parties' failure to specify that retirees' insurance benefits expired with the termination of the collective bargaining agreements, we hold that the general termination clause does not support a finding that retiree benefits ended when the agreements expired."
 
 
 56
 773 F.2d at 676.
 
 
 57
 We fully concur with the decisions of the Court of Appeals for the Sixth Circuit in these two cases, more especially since the insurance agreements here specifically stated that the pensioners "shall not have such coverage terminated or reduced ... so long as the individual remains retired from the company or receives a surviving spouse's benefit, notwithstanding the expiration of this agreement."
 
 
 58
 The trial court was clearly correct in deciding that Connors' obligation to provide the insurance benefits continued after the expiration of the negotiated labor contract. See also, Bower v. Bunker Hill Co., 725 F.2d 1221 (9th Cir.1984); U.A.W. v. Cadillac Malleable Iron Co., 728 F.2d 807 (6th Cir.1984); Local 150-A UFCW v. Dubuque Packing Co., 756 F.2d 66, 70 (8th Cir.1985).
 
 
 59
 B. Obligation of H.K. Porter Co. to carry out the agreements made by Connors.
 
 1. The Alter Ego Principle
 
 60
 (a) Domination and Control
 
 
 61
 The district court, in considering whether the alter ego doctrine should apply to this case, considered what the Court of Appeals for the Fifth Circuit called "a laundry list of factors to be used in determining whether a subsidiary is the alter ego of its parent." United States v. Jon-T Chemicals, Inc., 768 F.2d 686 (5th Cir.1985). These, the Court stated, "include" whether:
 
 
 62
 (1) the parent and the subsidiary have common stock ownership;
 
 
 63
 (2) the parent and the subsidiary have common directors or officers;
 
 
 64
 (3) the parent and the subsidiary have common business departments;
 
 
 65
 (4) the parent and the subsidiary file consolidated financial statements and tax returns;
 
 
 66
 (5) the parent finances the subsidiary;
 
 
 67
 (6) the parent caused the incorporation of the subsidiary;
 
 
 68
 (7) the subsidiary operates with grossly inadequate capital;
 
 
 69
 (8) the parent pays the salaries and other expenses of the subsidiary;
 
 
 70
 (9) the subsidiary receives no business except that given to it by the parent;
 
 
 71
 (10) the parent uses the subsidiary's property as its own;
 
 
 72
 (11) the daily operations of the two corporations are not kept separate; and
 
 
 73
 (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.
 
 
 74
 Id. at 691-92.
 
 The court then stated:
 
 75
 Plaintiffs may have failed to prove by a preponderance of the evidence, properly analyzed, the entire laundry list of twelve factors to be used in determining whether or not a parent corporation is the alter ego of its subsidiary. This list is outlined in United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691 (5th Cir.1985). Of course, it is not necessary that plaintiffs prove the existence of all twelve factors. The Fifth Circuit did not weight the twelve factors in their order of significance. The court finds that enough of these factors do exist, without taking the time to mention each one, to indicate the necessary degree of control by H.K. Porter Company over Connors Steel Company to constitute an alter ego relationship in this case.
 
 
 76
 The court also stated that after the full trial:
 
 
 77
 The degree of Connors' autonomy from H.K. Porter was very questionable under the evidence received at the hearing which led to the preliminary injunction of April 3, 1987. Any lingering doubt on this subject has now been removed, and the court finds that insufficient Connors autonomy existed to insulate H.K. Porter from Connors' contractual obligations to its retired employees under this particular collective bargaining agreement and the collateral insurance agreements.
 
 
 78
 The trial court thus stated its findings in terms of "the necessary degree of control by H.K. Porter Company over Connors Steel Company" and in terms of the "autonomy" of Connors.
 
 
 79
 We have carefully reviewed the record and are satisfied that Items 1, 4, 5 and 6 were present here and that Items 2, 3, 7, 8 and 10 partially existed as between Connors and H.K. Porter for at least several years before Porter caused Connors to seek protection under the bankruptcy laws.
 
 As the court noted in Jon-T:
 
 80
 As we have noted, there is no litmus test for determining whether a subsidiary is the alter ego of its parent. Instead, we must look to the totality of the circumstances. Resolution of the alter ego issue is heavily fact-specific and, as such, is peculiarly within the province of the trial court. Consequently in reviewing the district court's finding, we apply the clearly erroneous standard of review.... We will reverse only if, after reviewing the evidence as a whole, we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).
 
 
 81
 Id. (Citations omitted).
 
 
 82
 Appellant does not seriously challenge the above standard for establishing control and domination by Porter. We are unpersuaded by its contention that the trial court's findings of fact thereabouts were without adequate support in the record. We conclude therefore that the trial court's decision that there was sufficient control and domination of Connors by Porter to satisfy this part of the alter ego requirement was not clearly erroneous.
 
 
 83
 (b) Fraud or Other Wrong
 
 
 84
 Appellants contend that even though the court might have properly found sufficient evidence of domination and control by Porter to satisfy this part of the alter ego principle, it was also incumbent on the plaintiffs to prove some act of fraud or wrongful conduct by Porter. Although appellant contends that this section 301 action must be decided by federal law, it cited United States v. Jon T Chemicals, Inc., supra, in support of its contention. Jon T was a diversity case as are a number of the other cases cited by appellants for their contention as to the need for appellees' proving some kind of fraud or other wrongdoing which caused the injury to the plaintiffs below.
 
 
 85
 Nevertheless, we recognize that we are required to apply a body of federal common law that has developed in connection with section 301 in cases seeking to invoke the alter ego principle. This law is well stated by the district court in United Paperworkers Intern. U. v. Penntech Papers, 439 F.Supp. 610 (D.Me.1977), aff'd 583 F.2d 33 (1st Cir.1978).
 
 
 86
 Restating the instrumentality [or the alter ego] rule we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:
 
 
 87
 (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
 
 
 88
 (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
 
 
 89
 (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
 
 
 90
 Id. at 618.
 
 
 91
 The district court in this case did not address the question dealing with the second requirement outlined above; that is, whether the control which the court found existed was used by Porter "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty or a dishonest and unjust act in contravention of plaintiff's legal rights." However, inasmuch as we have concluded, in affirming the trial court, and as discussed infra, that Porter is liable to the plaintiff class as a successor corporation, it is clear that Porter used its control "to perpetrate the violation of a ... positive legal duty"....
 
 
 92
 There is no dispute about the fact that Porter caused the termination of the payments which we have heretofore held Connors was required to make to the plaintiff class. We conclude therefore that under the federal common law, as described by appellants, the trial court properly found that Porter was the alter ego of Connors with respect to the issues involved here.
 
 2. H.K. Porter as Successor to Connors
 
 93
 In addition to finding Porter liable as the alter ego of Connors, the trial court found Porter responsible as a "successor employer" as that term is described in NLRB v. Burns Security Services, 406 U.S. 272, 284, 92 S.Ct. 1571, 1580, 32 L.Ed.2d 61 (1972).
 
 
 94
 As pointed out by the trial court, the Supreme Court said in Burns:
 
 
 95
 In many cases, of course successor employers will find it advantageous not only to recognize and bargain with the union but also to observe the preexisting contract rather than to face uncertainty and turmoil. Also in a variety of circumstances involving a merger, stock acquisition, reorganization, or assets purchased, the board might properly find as a matter of fact that the successor had assumed the obligations under the old contract.
 
 
 96
 406 U.S. at 291, 92 S.Ct. at 1584. (Emphasis added.)
 
 
 97
 Based largely upon the trial court's emphasis on the action of Porter in deciding to continue to pay the retirees' benefits between 1983 and 1987, the trial court found as a fact that "H.K. Porter Company acted as a successor employee." This finding was in the following language:
 
 
 98
 At least for the purpose of funding plaintiffs' benefits, H.K. Porter Company acted as a "successor employer" as that term is described in N.L.R.B. v. Burns Security Services, 406 U.S. 272, 284, 92 S.Ct. 1571, 1580 (1972). The Burns Court noted that the "successor corporation" even though it had not signed the collective bargaining agreement, might decide to honor its provisions and thus be bound by them.
 
 
 99
 This was a finding of fact that Porter had "assumed the obligations" under the collective bargaining agreement to pay these benefits.
 
 
 100
 Porter contends that this finding by the trial court is contrary to the Supreme Court's holding in Burns. It bases this contention on the fact that Connors had not been in an operating status for several years. We do not think this fact is conclusive, because 29 U.S.C. Sec. 185(a) specifically authorizes actions under Sec. 301 to be brought "for violation of contracts between an employer and a labor organization." That is precisely what we have here. The trial court here made this finding that the Court stated in Burns, the NLRB "might properly find as a matter of fact" in an appropriate case.
 
 3. Other Grounds
 
 101
 Because of our decision as to the alter ego and successor employer findings, it is unnecessary to consider any other basis for affirming the trial court's judgment that Porter is liable for continuing the insurance payments during the continuance of the lives of the plaintiff class.
 
 C. Cross-Appeal
 
 102
 In the trial court's memorandum opinion, the following statement appears:
 
 
 103
 As yet unruled upon is H.K. Porter's motion for partial summary judgment which seeks to preclude the plaintiff class from "recovering extra-contractual compensatory and punitive damages" and seeks to limit the "recovery to the amount of planned benefits claimed to be due and owing for claims incurred but unpaid." Because ERISA is clearly implicated here, the following ERISA authorities preclude plaintiffs from obtaining any relief except the relief allowed them under ERISA:
 
 
 104
 Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 107 S.Ct. 1542 [95 L.Ed.2d 55] (1987)
 
 
 105
 Pilot Life Insurance Company v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549 [95 L.Ed.2d 39] (1987)
 
 
 106
 Howard v. Parisian, Inc., 807 F.2d 1560 (11th Cir.1987) (which preceded but correctly anticipated Metropolitan Life and Pilot Life )
 
 
 107
 ... Therefore, defendant's motion for partial summary judgment will be partially granted.
 
 
 108
 Appellees contend that they are entitled to recover extra-contractual damages for emotional distress and pain and suffering and also for punitive damages, both under ERISA and under Section 301 of the Labor Act. The trial court apparently concluded that ERISA pre-empted Section 301, because it cited two Supreme Court cases and one case from this court in support of its action in dismissing the claims for extra-contractual damages. However, the Supreme Court and this court in the cases cited dealt only with the pre-emption by ERISA of state common law claims. They did not deal with the continued viability of actions brought under Section 301 of the Labor Act. Since the appellees have cross-appealed from the trial court's order dismissing "all non-ERISA claims" we must consider whether such a cause of action may still be pursued.
 
 
 109
 (1) Damages Under ERISA
 
 
 110
 It is clear that the Supreme Court has not yet decided whether extra-contractual damages can be recovered under Section 502(a)(3) of ERISA, 29 U.S.C. Sec. 1132(a)(3). However, appellants contend that the Supreme Court's decision in Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), supports their contention that no such claim for damages can be based on ERISA. In Russell, the Court concluded that ERISA's breach of fiduciary duty provision, Section 409(a), 29 U.S.C. Sec. 1109(a), provided no express authority for an award of punitive damages to a beneficiary. The Court also declined to decide whether any other section of the ERISA statute might permit recovery on such a claim.
 
 
 111
 Nevertheless, the Court of Appeals for the Ninth Circuit in the recent case of Sokol v. Bernstein, 803 F.2d 532 (9th Cir.1986), said:
 
 
 112
 It is important to note that, mechanically applied to the present case, Russell is not dispositive; the district court herein relied on Section 502(a)(3) of ERISA, 29 U.S.C. Sec. 1132(a)(3) rather than on Section 409. However, a textual exegisis of the Russell opinion, combined with careful examination of the statute's structure and legislative history, compels the conclusion that damages for emotional distress are unavailable under Section 502(a)(3) as well as under Section 409.
 
 
 113
 803 F.2d at 534.
 
 
 114
 The Court also stated:Russell sheds light on another major reason to disallow recovery of extra-contractual damages under Section 502(a)(3)--Congress' glaring omission of any mention of extra contractual damages in general, or emotional distress in particular: "significantly, the statutory provision explicitly authorizing a beneficiary to bring an action to enforce his rights under the plan--Section 402(a)(1)(b) ..--says nothing about the recovery of extra contractual damages, or about the possible consequences of delay in the planned administrative's processing of a disputed claim." Id. at 309. Again, there is nothing in this excerpt to indicate that the underlying reasoning does not apply to Section 502(a)....
 
 
 115
 Id. at 536.
 
 
 116
 The court also pointed out that it had previously arrived at the same conclusion in Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1306-07 (9th Cir.1986), which the court said was a binding precedent for the Sokol decision.
 
 
 117
 In Sommers Drug Stores Co. Profit Sharing Trust v. Corrigan Enterprises, Inc., 793 F.2d 1456, 1462-64 (5th Cir.1986), the court held that neither Section 502(a)(2) nor Section 502(a)(3) permits a participant or beneficiary to recover punitive damages. See also Powell v. Chesapeake & Potomac Co., 780 F.2d 419, 424 (4th Cir.1985), which holds that Section 502(a)(3) does not permit the recovery of extra-contractual compensatory or punitive damages.
 
 
 118
 We agree with these decisions and conclude that the trial court correctly held that no extra-contractual damages were recoverable under ERISA in this case.
 
 
 119
 (2) Damages Under Section 301 LMRA
 
 
 120
 Appellees contend further, however, that they are entitled to recover such damages under Section 301 of LMRA. Since the trial court dismissed all non-ERISA claims, it must have dismissed the claim under Section 301 on the theory that no extra-contractual damages were recoverable under the Labor Act.
 
 
 121
 We conclude that the question whether such damages may be recovered under the LMRA depends upon whether the recoveries under that Act are to be considered equitable or legal. In arriving at that conclusion, it is also appropriate for us to be informed by the clear sayings of the Supreme Court in cases in which other issues may have been decided. Referring especially to the language of the Court in Dedeaux, supra, we note that the Court several times spoke of the value of having the ERISA remedy the exclusive remedy for failure properly to administer a plan. The Court said:
 
 
 122
 The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argues strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive. Its conclusion is fully confirmed by the legislative history of the civil enforcement provisions....
 
 
 123
 481 U.S. 41, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987) (emphasis added.)
 
 
 124
 While this language deals with the exclusivity principle as relating to the pre-emption of all state remedies, it is also an instructive statement that we should observe in attempting to construe the remedies that may be available under Section 301 of the LMRA.
 
 
 125
 The Court of Appeals for the Fifth Circuit in Calamia v. Spivey, 632 F.2d 1235 (1980), decided whether in a claim such as that now before us the plaintiff was entitled to a trial by jury. The court there held that the plaintiff's right depended upon whether the proceeding was one that sounded in equity or at law. The court stated:
 
 
 126
 Since Congress has the power to entrust the enforcement of new rights to courts sitting as in equity, Curtis v. Loether, 415 U.S. 189 at 195 [94 S.Ct. 1005 at 1008, 39 L.Ed.2d 260 (1974) ], the first step in determining the legal or equitable nature of an action such as this is to examine the intent of Congress. If congressional intent is not apparent the next step is to examine the "pre-merger custom with respect to such questions", looking at how similar actions were treated before the merger of law and equity. Ross v. Bernhard, 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 738 n. 10 [24 L.Ed.2d 729 (1970) ]. See also Curtis v. Loether, supra, 415 U.S. at 195-96, 94 S.Ct. at 1009....
 
 
 127
 In the absence of any clear congressional intent, the Court in Wardle [Wardle v. Central States, Southeast & Southwest Areas Pension Fund, 627 F.2d 820 (7th Cir.1980) ] examined prior cases and determined that similar claims were previously considered equitable and that the kind of determination required--whether the pension fund acted arbitrarily and capriciously--was one traditionally performed by judges. Wardle v. Central States Southeast & Southwest Areas Pension Fund, supra, 627 F.2d at 829, 830. We concur in that determination....
 
 
 128
 632 F.2d at 1237.[1] See also In re Vorpahl, 695 F.2d 318 (8th Cir.1982).
 
 
 129
 We conclude that the trial court did not err in holding that plaintiffs were not entitled to recover extra-contractual compensatory and punitive damages under Section 301 of the Labor Act.
 
 IV. CONCLUSION
 
 130
 The appellees also cross-appealed from the denial by the trial court of a trial by jury. However, they urge this cross-appeal only in the event that this court should reverse the trial court's decision either on the appeal or cross-appeal. In view of the fact that we are affirming the trial court's judgment in toto we do not discuss the issue of the right to a jury trial.
 
 
 131
 The judgment is AFFIRMED.
 
 
 
 [1]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this Court adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981