[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14697
Non-Argument Calendar
_____

D.C. Docket No. 1:10-cv-23512-AMS

EITZEN CHEMICAL (SINGAPORE) PTE, LTD.,
EITZEN CHEMICAL (USA), LLC,
EITZEN CHEMICAL A/S,

                                                        Plaintiffs-Appellants,

versus

CARIB PETROLEUM,
a Bahamian entity,
CARIB PETROLEUM, INC.,
a Florida corp.,
CARLOS H. GAMBOA,
individually,

                                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 4, 2018)

Before MARCUS, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

This is an appeal from a bench trial before a magistrate judge involving breach of contract claims governed by maritime law.[1]  The sole issue in this case is whether the trial court erred in denying the plaintiffs' claim seeking to pierce the corporate veil of the defendant corporation in order to hold the individual owner and/or a sister corporation liable for the damages awarded based on an alter ego theory of liability.  We affirm.

## I.    FACTS AND PROCEDURAL HISTORY

Carlos Gamboa is the individual owner and operator of both Carib Petroleum, a Bahamian corporation ("Carib-Bahamas"), and Carib Petroleum, Inc., a Florida Corporation ("Carib-Florida"). In December 2009, "Carib Petroleum," entered into a maritime contract[2] with Eitzen Chemical A/S, a company that operates numerous petrochemical shipping vessels used to transport various chemicals around the world on behalf of different chartering companies. "Carib Petroleum" was specified in the contract as the charterer, with no distinction as to whether "Carib Petroleum" referred to Carib-Bahamas or Carib-Florida. Under the

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties jointly consented to the jurisdiction of the magistrate judge to try the case and enter final judgment.

[2] In the shipping industry, the initial maritime contracts are referred to as "charter parties," and the final contract is a "fixture recap."  However, for purposes of this appeal, we will use the generic term "contract."

2

contract, the vessel MT/GLEN ("the Glen"), commercially operated by Eitzen A/S, was to transport cargo described, in relevant part, as "5,000 MT of Tecsol (Diesel without aromatics API abt 33)" from Venezuela to the Dominican Republic. Tecsol is a solvent or degreaser and is frequently used as a base for paint. The contract provided for "demurrage" in the amount of $10,000 per day, pro-rated. Demurrage is an agreed upon amount of liquidated damages for any delays beyond the anticipated amount of time specified in the contract for loading and unloading the cargo ("the lay time").

The Glen successfully loaded the cargo in Venezuela with no issues from December 12, 2009 to December 15, 2009, and departed for the Dominican Republic.  Notably, there were three bills of lading concerning the cargo on the Glen—one described the cargo as Tecsol, another described the cargo as a degreaser solvent, and a third described it as diesel with no mention of Tecsol or solvent. The Glen arrived in the Dominican Republic on approximately December 22, 2009, and issued a notice of readiness indicating that it was ready to unload the cargo. However, there was a delay, and the cargo was not unloaded until December 24, and 25, 2009, which exceeded the lay time of 72 hours provided for under the contract causing Eitzen to incur additional costs.

Subsequently, in June 2010, Eitzen Chemical entered into a second contract with Carib Petroleum to transport Tecsol from Venezuela to the Dominican

Republic aboard the vessel Sichem Challenge, which was owned by Eitzen (Singapore), PTE, Ltd. The cargo was described as "Distillates—max 2 grads wvns intended cargo is about 5,000 MT of Tecsol (Diesel without aromatics API apt 33)."   Again, the contract did not specify which Carib entity was the charterer. On June 29, 2010, the vessel arrived in Puerto Cabello, Venezuela, and began loading the cargo the next morning. On July 2, 2010, the Venezuelan National Guard stopped the loading of the cargo, samples of the cargo were taken, and the Sichem Challenge was detained under the authority of the Venezuelan prosecutor's office. At that time, the authorities gave no reason for the halting of the loading of the cargo, but the vessel's crew was instructed not to leave the port.

Eitzen retained a protection and indemnity correspondent, Jose Sabatino, to try to resolve the dispute. Sabatino's investigation revealed that the Venezuelan government claimed that tests of the cargo samples indicated that the cargo was national diesel fuel without the requisite export permit, not Tecsol.[3]  As a result, the government initiated a smuggling investigation against the exporter, Tecnopetrol, and its principal, Javier Bertucci.  As part of its investigation, the government detained the Sichem Challenge, believing it to be an asset of Bertucci or Tecnopetrol. Over the next several weeks, Sabatino attempted to convince Venezuelan officials that the Sichem Challenge was not such an asset and filed

---

[3] The Venezuelan government has export controls for certain products and the ability to regulate exports, including national diesel fuel.

4

several petitions for release of the vessel. The prosecutor's office eventually ordered that the cargo be discharged, and the cargo was removed from the vessel between August 27, 2010, and September 2, 2010. The Sichem Challenge left port the following day.

Thereafter, Eitzen Chemical A/S, Eitzen Chemical (USA), LLC, and Eitzen Chemical (Singapore) PTE, Ltd. (collectively referred to as "Eitzen") initiated a civil suit against Carib-Bahamas, Carib-Florida, and Carlos Gamboa, in his individual capacity, for breach of contract based on the delay of unloading the cargo on the Glen and the detention of the Sichem Challenge.  In its second-amended complaint, Eitzen sought demurrage in the amount of $10,659.72 plus interest, costs, and attorney's fees for the breach of contract associated with the delay in unloading the cargo on the Glen (Count 1).  Eitzen sought detention damages[4] in the amount of $897,084.19 plus fees and costs for the breach of contract associated with the detention of the Sichem Challenge from July 2, 2010 to September 4, 2010 (Count 2).  Finally, Eitzen sought to pierce the corporate veil of Carib-Bahamas to hold Carib-Florida and Gamboa, in his individual capacity, liable for the breach of contract as "alter egos" of Carib-Bahamas (Count 3).

At the bench trial, Luis Tewes testified that he was a broker with Southport Maritime, Inc., a tanker broker company that makes arrangements between

---

[4] Detention damages are a form of unliquidated damages designed to compensate the owner for abnormal delays that prevent the vessel from pursuing its normal operation.

5

shipping vessel owners and businesses needing to charter shipping vessels to transport goods.  Gamboa contacted Tewes in December 2009 about chartering a vessel to transport Tecsol, which Gamboa described to Tewes as a solvent, and for "transportation purpose[s], it was like a diesel without aromatics."  In response, Tewes contacted Eitzen and served as the broker for both of the underlying contracts. Tewes testified that he knew Gamboa as the representative for "Carib Petroleum, Inc.," and that he had brokered several contracts for Carib Petroleum that pre-dated the formation of Carib-Florida. Tewes was unaware that there was more than one Carib entity, and he never inquired as to where Carib Petroleum was incorporated because that was not standard practice in the brokering business, although he knew Gamboa lived in Miami.

Eitzen's representative, Casper Cleeman, testified that Eitzen was unaware that there was more than one Carib entity because Eitzen had no written procedure for inquiring into the identity of the party chartering its vessels, and it was common in the trade to rely on the broker to vet the charterer. He acknowledged, however, that Eitzen did not rely on any belief that the chartering party was Carib-Florida, and he was unaware of any representation by Gamboa that the chartering entity was Carib-Florida as opposed to Carib-Bahamas. He acknowledged that there were multiple bills of lading for the cargo on the Glen that had varying descriptions of the cargo as "diesel," "solvent," and "Tecsol," but explained that this was of no

6

concern to Eitzen as those were all products that the vessel was permitted to transport.

Gamboa testified, in relevant part, that he is the principal of both Carib-Bahamas and Carib-Florida and that he controls both entities. He established Carib-Bahamas in 2002 and Carib-Florida in 2009. Both companies are operated primarily from either his office or his home in Miami, Florida. The companies do not have any employees, but there are "agents" that do work for the companies and are paid a commission for their services. Gamboa explained that Carib-Bahamas began doing business with Southport prior to the incorporation of Carib-Florida. When Carib-Bahamas started doing business with Southport, Gamboa completed a company profile for Southport's use, which contained information about the Bahamian entity. He stated that he never informed Southport of the creation of Carib-Florida because "[t]here was no reason to," as the only company he uses for conducting business is the Bahamian entity. He testified that Carib-Bahamas and Carib-Florida each had separate bank accounts, but, because all of the business is conducted through Carib-Bahamas, all of the money in the Carib-Florida account was from the Bahamian entity. He explained that Carib-Florida's account was used solely to pay debts on behalf of Carib-Bahamas, as well as to pay some personal expenses of Gamboa. He confirmed that, when a check was written out of Carib-Florida's account, he would get "reimbursement" from Carib-Bahamas's

7

account. Gamboa stated that he was the sole signatory on the accounts and that he paid some personal expenses from the Carib-Florida account because "that's where I generated my funds."

Gamboa stated that he thought he was buying Tecsol from Tecnopetrol, and that he had previously bought Tecsol from Tecnopetrol in the past.  He explained that he believed that Tecnopetrol had obtained the appropriate permits to export Tecsol from Venezuela, but he acknowledged that Bertucci had told him that, in Latin America, you "have to grease palms" (meaning pay bribes). Gamboa testified that there were many similarities between Venezuelan national diesel oil and Tecsol, as Tecsol could be used as a degreaser solvent, which is a distillate,[5] and diesel oil could also be used for this purpose.

With regard to the cargo on the Glen, Gamboa admitted that, after the cargo was loaded in Venezuela, but before it arrived to its destination, he instructed the vessel master to change the description of the cargo from Tecsol to "diesel." He explained that he requested this change because the cargo was going to be blended into a diesel once it arrived in the Dominican Republic.  He admitted that, if he had changed the description to diesel before the Glen left Venezuela, it would have been a problem because Tecnopetrol's license is for the export of Tecsol. Gamboa acknowledged that, when dealing with past shipments of Tecsol from Tecnopetrol,

---

[5] Gamboa testified that a "[d]istillate is a broad term for solvents, diesel, [and] marine gas oil."

8

he had specifically stated "that the product must be referred to as Tecsol (solvent), and not as a diesel without aromatics."

Based on the testimony and evidence presented during the bench trial, the trial court found that Carib-Bahamas and Carib-Florida were separate, sister corporations with common ownership, and that Carib-Bahamas was the entity that was a party to the underlying contracts, not Carib-Florida. The trial court found that "the cargo loaded on the Sichem Challenge was national diesel that Carib-Bahamas was attempting to smuggle out of Venezuela without the proper permits." The trial court also found that "Gamboa knew of the nature of the cargo he was exporting," as evidenced by (1) his repeated instructions that the cargo should not be referred to as diesel; (2) his directions to change the description of the cargo on the Glen after it left Venezuela; and (3) the fact that he was responsible for selling the cargo, and, therefore, would have had to know what he was selling and had purchased and sold the same cargo before. Accordingly, the trial court ruled, in relevant part, in favor of Eitzen on Counts 1 and 2, concluding that Carib-Bahamas was liable for the breach of contract damages and awarding Eitzen a total judgment of $1,110,276.99 against Carib-Bahamas.

However, with respect to Eitzen's veil-piercing claim in Count 3, the trial court found that Eitzen had failed to prove by a preponderance of the evidence that Carib-Florida should be held liable as the alter ego of the Carib-Bahamas. The

9

trial court found that there was a lack of evidence in the record with respect to many of the alter ego factors. For instance, although the two entities shared a common address, had common ownership, and Carib-Florida was used to handle Carib-Bahamas's financial transactions, the evidence established that the two entities maintained their separate corporate existences. Both entities had separate bank accounts, and there was no evidence regarding common business departments or whether the two entities filed consolidated financial statements or tax returns. Further, although all of Carib-Florida's funds were derived from the business of Carib-Bahamas, there was no evidence regarding whether Carib-Bahamas used the property of Carib-Florida as its own, or vice versa. The record was also silent as to whether the business records of the two companies were kept separate. Moreover, there was no evidence that Carib-Bahamas used Carib-Florida for any fraudulent purpose or to avoid its liabilities, or that Carib-Florida engaged in any fraudulent transactions itself. Thus, the trial court concluded that, absent a showing of fraud in the use of the corporate form itself, it was not sufficient to pierce the corporate veil of Carib-Bahamas to hold Carib-Florida liable merely because the two companies shared a common address and common ownership, or because the function of Carib-Florida was to handle Carib-Bahamas's financial transactions. Additionally, the trial court concluded that Eitzen had failed to prove that the corporate veil should be pierced to hold Gamboa individually liable as an alter ego

10

of Carib-Bahamas. The trial court explained that, although the evidence established that Gamboa dominated and controlled Carib-Bahamas, there was insufficient evidence to prove that Carib-Bahamas's corporate form was used for a fraudulent purpose as required to pierce the corporate veil for a breach of contract.  The trial court acknowledged that Gamboa personally fraudulently misrepresented the cargo and attempted to smuggle it out of Venezuela, and that generally a corporate officer is personally liable for tortious conduct, but Eitzen only brought claims for breach of contract, not substantive fraud counts.[6]  Finally, the trial court noted that, if Eitzen wanted to hold Gamboa personally liable for damages under the contract, it could have contracted for his liability.  Accordingly, the trial court ruled in favor of Carib-Florida and Gamboa on Count 3.

Following entry of judgment, Eitzen filed a motion for a new trial, arguing in part that the trial court misapprehended the relevant law concerning piercing of the corporate veil and failed to apply relevant equity principles. The magistrate judge denied the motion for a new trial.  Eitzen appealed, arguing that the trial court erred in denying its veil-piercing claim.

---

[6]  Eitzen sought to file a third-amended complaint in the trial court to add fraud counts against Gamboa, but the trial court denied the request as untimely, noting that Eitzen failed to provide any explanation as to why these claims could not have been raised prior to the deadline for amending the pleadings.

11

## II.    Discussion

"Whether a corporate entity will be disregarded depends upon the trial court's findings of fact." Talen's Landing, Inc. v. M/V Venture, II, 656 F.2d 1157, 1160 (5th Cir. 1981).  In a bench trial, findings of fact "may not be reversed unless clearly erroneous." United States v. Fidelity Capital Corp., 920 F.2d 827, 836 (11th Cir. 1991).  "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  Thus, "[i]f the trial court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." Id. at 573-74.  We review the trial court's application of the law to the findings of fact de novo. Fidelity, 920 F.2d at 836.

Federal common law applies to cases that arise under admiralty jurisdiction. Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23 (2004).  Under general principles of limited liability, creditors only have recourse against the corporate entity that incurred the liability, not against related corporations or the owner of a corporation.  See Baker v. Raymond Int'l, Inc., 656 F.2d 173, 179 (5th Cir. 1981).

12

In "exceptional circumstances," however, the courts may disregard the corporate form and pierce the corporate veil of the corporation in order to hold alter egos of the corporation liable for the obligations of the corporation.  See id. at 179-80. "[T]he burden rests on the party seeking to pierce the veil," and this burden is a "significant one."  Edwards Co., Inc. v. Monogram Indust., Inc., 700 F.2d 994, 999 (5th Cir. 1983).

There is no uniform standard test under federal common law for determining whether an alter ego relationship exists, and courts must instead look to the totality of the circumstances.  United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co., 855 F.2d 1499, 1506 (11th Cir. 1988) (citing United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 691 (5th Cir. 1985)).  Thus, "[r]esolution of the alter ego issue is heavily fact-specific and, as such, is peculiarly within the province of the trial court."  Id. (quoting Jon-T Chemicals, Inc., 768 F.2d at 691).

"[A] finding of control or domination of a corporation by an individual or a corporate entity and the use of the corporate fiction are necessary prerequisites to the application of the alter ego theory of liability."  Talen's Landing, 656 F.2d at 1161 n.6 (quoting Bourdagain Shipping Co. v. Saudi-America Line, S.A., 1979 A.M.C. 1058, 1071-72 (E.D. La. 1978)).  Once that is established, "it is appropriate to brush aside the corporate veil when it appears a corporation was organized for fraudulent purposes, illegality, or wrongdoing."  Id.; see also Jon-T

13

Chemicals, 768 F.2d at 692 (explaining that, "in contract cases, fraud is an essential element of an alter ego finding"). The focus is not on an individual's personal misconduct, but on whether the corporate form itself was abused and whether the misuse of the corporate form constituted the fraud or injustice complained of in the underlying suit. N.L.R.B. v. Greater Kansas City Roofing, 2 F.3d 1047, 1053 (10th Cir. 1993).

In determining whether a subsidiary is the alter ego of its parent corporation,[7] courts should consider various factors, including whether:

(1)   the parent and the subsidiary have common stock ownership;

(2)   the parent and the subsidiary have common directors or officers;

(3)   the parent and the subsidiary have common business departments;

(4)   the parent and the subsidiary file consolidated financial statements and tax returns;

(5)   the parent finances the subsidiary;

(6)   the parent caused the incorporation of the subsidiary;

(7)   the subsidiary operates with grossly inadequate capital;

(8)   the parent pays the salaries and other expenses of the subsidiary;

---

[7]  Notably, Carib-Bahamas and Carib-Florida are not parent-subsidiary corporations, but sister corporations with common ownership. This Circuit has yet to address whether a corporate veil may be pierced horizontally between sibling corporations under an alter ego theory of liability. However, this issue was not raised on appeal. Therefore, we assume, without deciding, for the purposes of this opinion, that a corporation may be held liable for the debts of a sister corporation and that the same factors applied in the parent-subsidiary context to determine alter ego status apply in the sibling corporation context.

(9)  the subsidiary receives no business except that given to it by the parent;

(10) the parent uses the subsidiary's property as its own;

(11) the daily operations of the two corporations are not kept separate; and

(12) the subsidiary does not observe basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

Jon-T Chemicals, 768 F.2d at 691-92.  It is not necessary that the party seeking to pierce the corporate veil prove all of the factors, but enough of the factors must exist to indicate the necessary degree of control by one company over the other to constitute an alter ego relationship.  United Steelworkers, 855 F.2d at 1506.  The fact that two companies have "one-hundred percent" common ownership is, alone, "an insufficient basis for applying the alter ego theory to pierce the corporate veil." Jon-T Chemicals, 768 F.2d at 691.

Eitzen argues that the trial court erred in denying its veil-piercing claim because there was "ample evidence" that Carib-Florida and Gamboa were the alter egos of Carib-Bahamas. In particular, Eitzen asserts that the following factors support the alter ego theory of liability and justify piercing Carib-Bahamas's corporate veil: (1) Gamboa owned, operated, and was the principal of, both Carib entities; (2) both Carib entities operated out of the same office in Miami, Florida; (3) Carib-Bahamas is undercapitalized; (4) Gamboa testified that "the function of

15

Carib-Florida is to receive funds from or on behalf of Carib-Bahamas and monies

owed by Carib-Bahamas and disburse funds to or on behalf of Carlos Gamboa for

personal use"; (5) Gamboa operates and controls both Carib entities and neither

entity has any employees; (6) "[a]s the sole owner, operator and controller of both

Carib entities, it is doubtful that Mr. Gamboa convenes and conducts shareholder

meetings or other corporate formalities"; and (7) Gamboa used one or both of the

entities to commit fraud and wrongdoing by unlawfully attempting to smuggle

diesel out of Venezuela.[8]

The trial court's determination that Eitzen failed to meet its burden of proof

on its veil-piercing claim is supported by the record and the findings of fact.

Although Eitzen presented some evidence in support of its position that

Carib-Florida and/or Gamboa were the alter egos of Carib-Bahamas—namely, that

the business of both Carib entities was conducted from Gamboa's home; both

Carib entities were owned and operated by Gamboa; all of the money in

Carib-Florida's account was from Carib-Bahamas's business transactions,[9] and

Carib-Florida was used to pay the expenses and debts of Carib-Bahamas, as well as

_____

[8] Although Eitzen asserts that Carib-Bahamas is undercapitalized, there was no evidence presented at trial regarding the capitalization of either Carib entity. Additionally, Eitzen's assertion that it is "doubtful" that Gamboa convenes and conducts shareholder meetings or observes other corporate formalities is purely speculative and not supported by any of the evidence submitted at trial.

[9] Notably, there was no evidence presented that Carib-Bahamas was fraudulently transferring all of its money or assets to Carib-Florida in order to defraud creditors, nor was such an allegation made by Eitzen.

16

some of Gamboa's personal expenses—as the trial court found, there was insufficient evidence concerning the two companies' bank records to establish a comingling of funds or that the corporate form was not observed.  Further, with regard to the payment of some of Gamboa's personal expenses, no evidence was presented regarding how the payments to Gamboa were made or whether those payments were part of his salary or distributions of profits.  Similarly, no evidence was presented that Gamboa improperly treated the funds of Carib-Bahamas as his own.  Moreover, in order to prevail on its claim, Eitzen was required to establish that the corporate form of Carib-Bahamas itself was abused.  In other words, Eitzen needed to show that Carib-Bahamas was a mere sham or organized to accomplish a fraudulent or illegal purpose.  Talen's Landing, 656 F.2d at 1161 n.6; see also Jon-T Chemicals, 768 F.2d at 692 ("[I]n contract cases, fraud is an *essential element* of an alter ego finding." (emphasis added)).

Eitzen maintains that the fraud element was satisfied because the trial court found that Gamboa knew of the true nature of the cargo and personally fraudulently misrepresented the cargo in order to facilitate the smuggling of national diesel fuel out of Venezuela.  However, in veil-piercing cases, the focus is not on an owner's personal misconduct, but on whether the corporate form itself

17

was abused.[10]  See Greater Kansas City Roofing, 2 F.3d at 1053.  In other words, although Gamboa's personal fraudulent misconduct may have caused Carib-Bahamas to breach the underlying conducts, in order to pierce the corporate veil the fraud complained of had to be the result of the inequitable use of the corporate form itself.  Id.; see also N. Am. Clearing, Inc. v. Brokerage Comput. Sys., Inc., 666 F. Supp. 2d 1299, 1307-08 (M.D. Fla. 2009) (explaining that, even if an officer's misconduct causes "a corporation to intentionally breach a contract or commit conversion," piercing of the corporate veil is not justified unless the misconduct involved improper use of the corporate form).  The evidence presented at the bench trial established that Carib-Bahamas was a functioning company that engaged in legitimate business transactions prior to the origination and breach of the underlying contracts.  No evidence was presented that established that Gamboa failed to observe corporate formalities, or that he was using the corporate form of Carib-Bahamas to mislead or defraud Eitzen or other creditors.  Accordingly, because Eitzen failed to present sufficient evidence that Carib-Bahamas was organized for a fraudulent or illegal purpose or that the corporate form itself was

---

[10] In order to hold Gamboa liable for his personal misconduct, Eitzen needed to plead a substantive fraud count in its complaint, which it did not.  See L.C.L. Theatres, Inc. v. Columbia Pictures Indus., Inc., 619 F.2d 455, 457 (5th Cir. 1980) (explaining that an individual officer or other agent of a corporation may be held individually liable when he personally participates in the tortious conduct that is the subject of the underlying suit).  Therefore, Gamboa's personal misconduct was not relevant to the determination of whether the corporate veil of Carib-Bahamas should be pierced in this case.

misused, the trial court properly denied the veil-piercing claim.[11]  <u>Talen's Landing</u>, 656 F.2d at 1161 n.6.

Finally, Eitzen argues that, in denying its veil-piercing claim, the magistrate judge failed to apply the equitable principles called for in maritime cases because it effectively leaves Eitzen without a remedy, as there is no way for it to collect on its judgment against Carib-Bahamas because all of the money is tied up in the Carib-Florida account. However, absent some other wrong or injustice that would result if the corporate veil is not pierced, a creditor's inability to collect a judgment alone is insufficient to justify piercing the corporate veil.  <u>See</u> <u>Greater Kansas City Roofing</u>, 2 F.3d at 1053 (explaining that "the mere fact that a corporation is incapable of paying all its debts is insufficient for a finding of injustice," as "[t]hat condition will exist in virtually all cases in which there is an attempt to pierce the corporate veil" (internal citations omitted)).

---

[11] Eitzen also argues that the denial of Count 3 directly conflicts with the trial court's denial of the defendants' pre-trial motion to dismiss the second-amended complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). This argument is unpersuasive because a trial court's determination that a complaint states a facially sufficient claim to survive a motion to dismiss is not indicative that the claim is necessarily meritorious. <u>Jackam v. Hosp. Corp. of Am. Mideast, Ltd.</u>, 800 F.2d 1577, 1580 (11th Cir. 1986) (explaining that, in evaluating a Rule 12(b)(6) motion to dismiss, the issue is not whether the plaintiff "may ultimately prevail on [its claim], but whether the allegations are sufficient to allow [the plaintiff] to conduct discovery in an attempt to prove [its] allegations).

19

Accordingly, in light of the findings of fact, the trial court did not err in denying Eitzen's veil-piercing claim, and the judgment of the trial court is **AFFIRMED**.