Ernest Lee HOLLINGSHEAD,
Jr., et al., Plaintiffs,

v.

BURFORD EQUIPMENT COMPANY,
et al., Defendants.

Charles K. CALLIHAN, et al., Plaintiffs,

v.

BURFORD EQUIPMENT COMPANY,
et al., Defendants.

Civ. A. Nos. 88–D–461–N, 89–D–179–N.

United States District Court,
M.D. Alabama, N.D.

July 2, 1993.

A. Brand Walton, Jr., Robert Tate, Birmingham, AL, for plaintiffs.

E.J. Saad, Mobile, AL, Jay Guin, Tuscaloosa, AL, for defendants.

## MEMORANDUM OPINION

DeMENT, District Judge.

In 1934, J. Lamar Burford, Sr. founded the company that became Burford Equipment Company ("Burford Equipment"), one of the defendants in this case.[1] Mr. Burford, Sr. died in 1971 and his son, J. Lamar Burford, Jr. also a defendant, took over the business. Burford, Inc., also a defendant, was incorpo-

---

1. The facts recited in this opinion are substantially similar to those recited in the court's Novem- ber 20, 1992 opinion.

rated in 1985 and owns 100% of Burford Equipment's outstanding shares. Defendant J. Lamar Burford, Jr. is the president and chairman of both corporations and owns 100% of the voting stock of Burford, Inc.

On April 26, 1987, Burford Equipment sold its assets (but not its stock) to Thompson Tractor & Equipment Company ("Thompson Tractor"). Although Burford Equipment is still incorporated, it is currently in the process of winding up. Burford, Inc. is still a fully functioning corporation.

In 1988, plaintiff Ernest L. Hollingshead, along with about 40 others, brought suit against Burford Equipment, Burford, Inc., and Lamar Burford, Jr., claiming that Burford Equipment had established a pension plan [2] which was subject to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* and further claiming that Burford Equipment had not fulfilled its obligations under that statute. *Hollingshead v. Burford Equip. Co.*, CV No. 88–D–461–N (M.D.Ala.). The *Hollingshead* plaintiffs are former employees of Burford Equipment or the spouses of former employees of Burford Equipment who were denied retirement benefits after Burford Equipment sold its assets to Thompson Tractor.

Several months after the initial lawsuit commenced, Mr. Burford sent a letter to certain of its former employees who were not involved in the *Hollingshead* action. In the letter, Mr. Burford offered to settle any outstanding claims these former employees might have against Burford Equipment. While some employees accepted the offer, others filed a second lawsuit, styled *Callihan v. Burford Equipment Company*, CV No. 89–D–179–N (M.D.Ala.). The *Callihan* plaintiffs represent a class of all persons who have a vested accrued benefit in Burford Equipment's retirement plan, except the *Hollingshead* plaintiffs, Lamar Burford and his wife,

and the employees who executed releases with respect to the Burford Equipment retirement plan.[3] These cases were consolidated on April 10, 1989.[4]

On October 15, 1990, this court issued a memorandum opinion in which it found that Burford Equipment's service-award program was a defined-benefit program which was subject to ERISA guidelines and that the Burford Equipment employees' claims were not barred by the statute of limitations. In the opinion, the court also found that the normal retirement age was 62 and that a subsidized early retirement benefit was available; that Burford Equipment's retirement plan was not required to be qualified for tax purposes; that Burford Equipment is not required to provide a subsidized joint and survivor annuity; that Burford's liability to provide benefits should be calculated on the basis of the present value of the accrued benefits promised to Burford Equipment employees; and that Burford is allowed by law to integrate Social Security benefits with pension benefits, although the court did not grant summary judgment as to the extent of permissible integration.

On July 12, 1991, the court issued an order in which it found that the Burford retirement plan uses a 10–year cliff vesting schedule for its normal retirement program and that Burford Equipment's liability is not limited to the initial funding of the retirement plan but "includes liability for deficiencies which may arise after the plan is initially funded and before all benefits to which plaintiffs are legally entitled are fully paid." The plan fiduciaries were also removed pursuant to this order.

On November 30, 1992, the court again resolved several pending motions, finding: that in order to qualify for the early retirement benefit, an employee must be at least 55 years old and have 15 years of service; that the "same desk" rule applies; which

---

2. This plan, also known as the "service-award program," is in addition to Burford Equipment's profit-sharing program. The court will refer to both plans as the "Burford Program" and will distinguish between the two plans as necessary.

3. The class was certified on January 23, 1992.

4. Burford Equipment has also filed two declaratory judgment actions against its insurers, *Burford Equipment Co. v. Centennial Ins. Co.*, 89–D–183–N and *Burford Equipment Co. v. Centennial Ins. Co.*, 89–D–518–N. These cases are currently on appeal.

benefit accrual rule should be used; and determining that the trust should be liquidated.[5] 809 F.Supp. 906.

On December 10, 1992, this matter was tried before the court. The sole remaining issue is the personal liability of Burford, Inc. and Mr. Burford for Burford Equipment's violations of ERISA.

## DISCUSSION

Plaintiffs first argue that Burford, Inc. should be held liable for the ERISA obligations of Burford Equipment because the subsidiary company is the alter ego or instrumentality of Burford, Inc. According to the plaintiffs, Mr. Burford also treated Burford Equipment as his alter ego so that he too should be held liable for its debts.

### A. *Liability of Burford, Inc.*

■ ERISA itself contains no provisions that would enable one to determine when it is appropriate to pierce the corporate veil. However, the Supreme Court has indicated that "the doctrine of corporate entity should not be regarded when to do so would work fraud or injustice." *Taylor v. Standard Gas Co.*, 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939). The Court has also stated that the corporate form may not defeat overriding federal legislative policies. *See Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974). As one court has stated:

> The general rule adopted in the federal cases in that a corporate entity may be disregarded in the interest of public convenience, fairness, and equity. In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine....

*Alman v. Danin*, 801 F.2d 1, 3 (1st Cir.1986) (*quoting Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981) (internal citations omitted)).

The stated purpose of ERISA is to ensure the security of employee benefit plans, in part by protecting workers from their employers' attempts to deny them these benefits. 29 U.S.C. § 1001(a); *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460–61 (7th Cir.1991) (discussing policy behind ERISA in conjunction with alter ego doctrine). As several courts have recognized, ERISA "cannot be said to attach great weight to corporate form." *Alman*, 801 F.2d at 3. *See also Lumpkin*, 933 F.2d at 461 (discussing several ERISA cases in which courts disregarded the corporate form).

On several occasions, the Supreme Court has instructed the federal courts to "develop a federal common law" of ERISA where the statute itself is less than explicit. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987). While in some cases, the courts have borrowed a standard from other federal statutes, they have often turned to state law to supply the federal rule. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109–10, 109 S.Ct. 948, 953–54, 103 L.Ed.2d 80 (1989) (discussing standard of review for actions of ERISA-plan fiduciaries). Thus, because the statute itself is silent on the issue, the court here will look primarily to federal law and secondarily to state law.

In *United Steelworkers of America v. Connors Steel*, 855 F.2d 1499 (11th Cir.1988), the court affirmed the trial court's finding that a parent corporation could be liable for the ERISA welfare-benefit plan adopted by its subsidiary. The *Connors Steel* panel adopted the alter ego rule articulated by the First Circuit in *United Paperworkers Int'l v. Penntech Papers*, 439 F.Supp. 610 (D.Me. 1977), *aff'd*, 583 F.2d 33 (1st Cir.1978), explaining:

> Restating the instrumentality [or the alter ego] rule we may say that in any case,

---

**5.** The court, recognizing that its November 30, 1992 opinion might well have raised new issues, invited the parties to bring them to the court's attention. Plaintiffs then filed a motion for summary judgment as to the valuation date used to calculate benefits. On May 6, 1993, the court established April 27, 1987 as the valuation date.

except express agency, estoppel or direct tort, three elements must be proved:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will, or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Connors Steel,* 855 F.2d at 1506–07 (internal citations omitted). *Compare First Health v. Blanton,* 585 So.2d 1331 (Ala.1991).

### 1. Domination and Control

■ In order to prove that a business organization is an alter ego, the plaintiffs must show that one organization completely controlled and dominated the other in relation to the transaction attacked. The *Connors Steel* panel indicated that a "laundry list of factors" can be used in determining whether a subsidiary is under the domination and control of its parent. *Id.* at 1505 (citations omitted).[6] These factors include:

(1) whether the parent and the subsidiary have common stock ownership;

(2) whether the parent and the subsidiary have common directors and officers;

(3) whether the parent and the subsidiary have common business departments;

(4) whether the parent and the subsidiary file consolidated financial statements and tax returns;

(5) whether the parent finances the subsidiary;

(6) whether the parent caused the incorporation of the subsidiary;

(7) whether the subsidiary operates with inadequate capital;

(8) whether the parent pays the salaries and other expenses of the subsidiary;

(9) whether the subsidiary receives no business except that given it by the parent;

(10) whether the parent uses the subsidiary's property as its own;

(11) whether the daily operations of the two are kept separate; and

(12) whether the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Id.* (citations omitted).

The court did not assign greater or lesser importance to any of these factors, nor did it indicate how many factors must be present before the district court may legitimately find domination by the parent. The panel noted that four factors were present in the case before it and that five other factors, although not entirely present, were implicated. Thus, it is clear that the plaintiffs do not have to prove the existence of all twelve factors in order to prevail. It is also clear that the court may assign some relative wight based upon its familiarity with the record.[7]

The court finds that factor 1 (common stock ownership) is present. Burford, Inc. owns 100% of the outstanding Burford Equipment stock. Joint Stipulation of Facts

---

**6.** Although the *Connors Steel* court describes this list as being used to determine whether a subsidiary is the alter ego of its parent, it is clear from the context of its opinion that this list deals with domination and control, the first element of the alter ego test.

**7.** Defendants evidently read *Connors Steel* as imposing a requirement that the *same* nine factors be present before the court can impose liability upon the dominant party. However, the court believes that this interpretation is not consistent with the approach taken by the Eleventh Circuit.

The district court did not discuss the factors one by one, but merely noted that "enough of these factors do exist ... to indicate the necessary degree of control ..." *Id.* This suggests that a certain number of the factors must be present, not that any particular factor or factors is essential.

Here, the parties agree that factor 5 (financing of the subsidiary by the parent), factor 6 (parent caused the incorporation of the subsidiary), and factor 9 (subsidiary receives no business except that given by the parent) are not present.

¶ 1. Mr. Burford owns all of the outstanding voting shares of Burford Inc. and somewhere between 75% and 90% of the nonvoting shares. Joint Stipulation of Facts ¶ 6; Deposition of J. Lamar Burford, Jr. taken December ("Burford Dep. II") at 14–16.

The court also finds that factor 2 (common directors and officers) is present.[8] A comparison of the two companies reveals that the officers were identical, although they held different positions in each organization and that the directors were identical, except that Mr. Burford's sister was a director of Burford, Inc. but not of Burford Equipment. *See* Deposition of J. Lamar Burford, Jr. taken October 25, 1989 ("Burford Dep. I") at 144, 235; Burford Dep. II at 7. However, it is also true that, during its existence, Burford Equipment has had a number of directors and officers who have never been involved with Burford, Inc. *See* Deposition of George M. Hutson ("Hutson Dep.") at 9, 95. *See also* Joint Stipulation of Facts at ¶ 5. The majority of these people served their terms before Burford, Inc. was incorporated, making their presence on the board largely irrelevant.

The court further finds (and the defendants admit) that factor 3 (common business departments) and factor 4 (consolidated financial statements) are also present. The remaining factors are disputed and the court must devote discussion to its reasons for deciding as it does.

a. *Does the parent pay salaries and expenses of the subsidiary?*

The court finds that Burford, Inc. pays the salaries and expenses of Burford Equipment, noting the following exchange from the deposition of Sharon Jackson, the financial manager [9] for Burford, Inc.:

Q: When [Control Data Business Services] send[s] a bill, is that bill in the name of Burford Equipment Company or Burford, Inc.?

A: It's in the name of Burford, Inc.

Q: And the individuals who are receiving retirement pay receive it from Burford, Inc.?

A: They receive their pay from Burford Equipment Company. Burford, Inc. issues the checks.

Q: Does the check say who the payor or paying entity is?

A: It says Burford, Inc.

Q: So on the check that the retiree receives it indicates that he or she is being paid by Burford, Inc.; correct?

A: That's right.

Deposition of Sharon Jackson at 103–04.

Plaintiffs argue that above-quoted exchange indicates that Burford, Inc. not only paid the salaries and expenses of its subsidiary, but that it made some of the very payments at issue in this case. *See also* Joint Stipulation of Facts at ¶ 7.

Defendants argue that while the checks may show the paying entity as "Burford, Inc.," the checks are drawn on a Burford Equipment account. Jackson Dep. at 91, 103, 107. While this practice may indeed support an argument that Burford Equipment does pay its own expenses, it also underscores the extremely cozy relationship between the two companies. There are no formal documents showing the transfer of funds between the accounts. Ms. Jackson testified that the money is transferred every two weeks; Mr. Burford testified that money is transferred "as needed." Jackson Dep. at 107, Burford Dep. II at 21. The high degree of symbiotic dealing and informality persuades the court that Burford, Inc, pays the salaries and expenses for Burford, Inc.

b. *Does the parent use the subsidiary's property as its own?*

Plaintiffs have observed that Mr. Burford transferred certain aircraft and watercraft between Burford Equipment and Burford, Inc. *See* Jackson Dep. at 114–115. *See also* Hutson Dep. at 140–44. Although Burford Equipment originally owned the watercraft, it transferred the craft to Burford, Inc. in

---

**8.** Defendants admit this is "partially" true.

**9.** Ms. Jackson was formerly the manager of finance and administration for Burford Equipment.

1987 and the proceeds from its sale were paid to Burford, Inc. Burford, Inc. repaid Burford Equipment by "dividending" the money. Jackson Dep. at 114–15. The dividend was declared at a Burford, Inc. board meeting. *Id.* The court cannot find that anything in this transaction necessarily offends the corporate structure.

However, it also appears that funds were shifted between the two companies at the discretion of Ms. Jackson and the management of Burford, Inc. Jackson Dep. at 117–18. As discussed above, there is no documentation of these monetary transfers and no documentation authorizing Burford, Inc. management to transfer this money. *Id.* at 106–07, 117. Mr. Burford testified that he moved funds back and forth between the two companies "as needed." Burford Dep. II at 21. Burford, Inc. entered contracts (with Mr. Burford) which bound Burford Equipment. Burford Dep. I at 177–81. On occasion, Burford, Inc. paid Burford Equipment's utilities. Jackson Dep. at 117.[10] Ms. Jackson denied all knowledge of any transfers between the corporations other than those discussed above. Jackson Dep. at 116. It also appears that some of the money received by Burford Equipment from the sale of its assets may have been used by Burford, Inc. to redeem the stock owned by Laura Sullivan, Mr. Burford's sister. Burford Dep. II at 18.[11]

Based upon the facts before it, the court finds that this factor is at least partially present. While on some occasions Burford, Inc. reimbursed Burford Equipment for the use of its property, it did not always do so.

Moreover, if funds could be transferred at will between the two corporations, once again this highlights the close relationship between the Burford Equipment and Burford, Inc.

c. *Are the daily operations of the two corporations kept separate?*

Plaintiffs argue that the daily operations of the two corporations were not kept separate. As noted above, Ms. Jackson testified that Burford, Inc. checks were used to pay Burford Equipment debts. It appears that Burford Equipment funds were used to cover shortfalls in Burford, Inc.'s operations. For example, Mr. Burford testified that on occasion, Burford Equipment funds were used to pay insurance premiums and mortgage payments for Burford, Inc.'s restaurant in Pensacola, Florida. Burford Dep. II at 48–49, 52–55.[12] After the sale of its assets, Burford Equipment met the payroll of Burford, Inc. *Id.* at 48. The firm which handled the preparation of Burford Equipment's payroll, Control Data Business Services, was paid for its services by Burford, Inc. Jackson Dep. at 103. Burford, Inc. acts as a "common paymaster"[13] for both corporations, although there apparently is not any written documentation granting Burford, Inc. that authority. Jackson Dep. at 105–08.

On the other hand, it is indisputable that Burford Equipment was not in the marina and restaurant business and that Burford, Inc. was not in the heavy equipment business and to that extent, the daily operations[14] of the two corporations were not intermingled while Burford Equipment was active. After

---

**10.** Both companies share one building which is owned by Burford Equipment. However, Ms. Jackson testified that she allocated to each company its "fair share" of the utilities. *See* Joint Stipulation of Facts at ¶ 9.

**11.** Mr. Burford wasn't certain where the money came from, although he thought there had been some "intermingling." *Id.* He later appears to deny this, claiming that the full amount received from the sales was still in Burford Equipment's bank account. *See* Burford Dep. II at 35.

**12.** This testimony is confused and somewhat contradictory. For example, Mr. Burford states that "there are certain insurance premiums that are intermingled with ours up here," but later on that same page he states that Burford Equipment

does not pay premiums on any property it does not own. Burford II at 49.

**13.** The Internal Revenue Code, 26 U.S.C. § 3121(s), allows one corporation to serve as a common paymaster and to pay the wages of another if the same person is employed by both corporations.

**14.** The court notes that the term "operations" has been a sticking point in the declaratory judgment action brought by Burford Equipment against its insurers. *See Burford Equipment Co. v. Centennial Ins. Co.,* CV No. 89–D–518–N (M.D.Ala. March 21, 1990) (Dubina, J.). Nothing in this limited discussion should be construed as having any relevance to that action.

the sale of assets, Ms. Jackson testified that when rental payments owed to Burford Equipment were paid, the funds were deposited in the Burford Equipment account. Jackson Dep. at 113.

As noted above, by keeping separate banking accounts, the defendants have made an effort to maintain distinct corporate identities. Balancing all of this evidence, the court finds that this factor is partially present.

### d. Were corporate formalities disregarded?

Finally, plaintiffs argue that Burford Equipment did not observe corporate formalities while it was in existence. As already discussed, both Burford Equipment and Burford, Inc. are closely held corporations. Burford, Inc. owns 100% of the stock of Burford Equipment. Mr. Burford owns somewhere between 75% and 100% of the nonvoting stock of Burford, Inc. and all of the voting stock. The remainder of the shares are owned by Mr. Burford's children. *Id.* at 13.

George Hutson, the former vice-president of Burford Equipment and one of the shareholders, has testified that no formal shareholder meetings were ever held, although he recalls meeting with Mr. Burford and his sister about "people who would be good to have on the Board of Directors." Hutson Dep. at 18–19. The Burford Equipment bylaws state that the Burford Equipment shareholders were to elect the directors. Plaintiffs' Ex. 5. There is no indication that any formal election was ever held; Mr. Burford evidently appointed officers and directors as he saw fit. Burford Dep. I at 233–34; Burford Dep. II at 47.[15]

Mr. Burford also stated that the boards of both Burford Equipment and Burford, Inc. meet on an irregular basis. Burford Dep. II at 12–13. However, the Burford Equipment board of directors did meet monthly before the sale of assets. *See, e.g.,* Plaintiffs' Exs. 6, 63; Defendants' Exs. 2, 3. This does not seem to have continued after the formation of Burford, Inc., as the boards of both compa-

nies now meet jointly, when they meet at all. Burford Dep. II at 12–13.

Based on these facts, the court finds that this factor is present. The court notes that both corporations were closely held, which may account for some of the informality. However, it cannot be dispositive on the question. In sum, the court finds that Burford, Inc. exercised sufficient control over the affairs of Burford Equipment so that Burford, Inc. can be said to have dominated Burford Equipment.

### 2. Misuse of Control

Next, the court must consider whether this control was misused in some way by Burford, Inc. The *Connors Steel* court, in reviewing the district court's decision, observed that the district court had not considered the second prong of the test—whether the subsidiary corporation was used by the parent "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of the plaintiff's legal rights." *Connors Steel,* 855 F.2d at 1506–07. The court continued:

> However, inasmuch as we have concluded, in affirming the trial court, and as discussed *infra,* that [the parent] is liable to the plaintiffs as a successor corporation, it is clear that [the parent] used its control "to perpetrate the violation of . . . a positive legal duty." There is no dispute about the fact that [the parent] caused the termination of the [ERISA] payments which we have heretofore held [the subsidiary] was required to make to the plaintiff class. We conclude therefore that under the federal common law . . . the trial court properly found that [the parent] was the alter ego of [its subsidiary]. . . .

*Id.* at 1507.

In other words, having concluded that the subsidiary was liable for the ERISA plan payments and having concluded that the parent dominated the subsidiary, the *Connors*

---

**15.** Burford, Inc. takes a similar approach to its meetings. According to Mr. Burford, there is "no set schedule" for board meetings and the meetings themselves are "informal." Burford Dep. II at 12, 42. Mr. Burford owns all of the voting stock of Burford, Inc., so there are no shareholder meetings.

*Steel* court was compelled to conclude that the parent had perpetrated "the violation of . . . a positive legal duty" precisely because the ERISA payments were not made. By this reasoning, because the court has concluded that Burford Equipment was obligated to fund its retirement plan and because the court has now found that Burford, Inc. dominated Burford Equipment, it must conclude that Burford, Inc. breached its "positive legal duty."

Ms. Jackson's testimony indicates that Burford Equipment management was aware that the pension plan was a corporate obligation and that she compiled a list of people who had not yet retired but who might soon do so. Jackson Dep. at 48–53. Mr. Robert N. Benck, a Burford Equipment vice-president and a member of its board of directors, also testified that he remembered getting this information together about a year before the sale of assets, before the sale was even discussed. Deposition of Robert N. Benck ("Benck Dep.") at 37. These events occurred around the same time as the incorporation of Burford, Inc. *Id.*

█ The primary reason for disregarding the corporate entity in the ERISA context is to prevent an employer from using the corporate form to evade its obligations to its employees. *See, e.g., Central States Pension Fund v. Sloan*, 902 F.2d 593, 597 (7th Cir. 1990) (defendants created new corporation to avoid paying pension benefits to employees of old corporation); *Pension Benefit Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir.), *cert. denied*, 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983) (intent of ERISA is to hold employers responsible for pension benefits; concerns for corporate separateness are secondary to mandate of ERISA).[16]

To respect the corporate integrity of Burford, Inc., especially where its own management does not attach much importance to the corporate form, would work a clear injustice and run contrary to the policies behind ERISA. Accordingly, the court finds that Burford, Inc. is liable for the judgment entered against Burford Equipment in this matter.

B. *Liability of J. Lamar Burford, Jr.*[17]

█ Plaintiffs also claim that the court should pierce the corporate veil and hold Mr. Burford personally liable for the Burford Equipment pension plan. The twelve-factor test discussed above is of limited utility in discussing whether Burford, Inc. was the alter ego of Mr. Burford, as it clearly contemplates a relationship between two corporations, rather than a relationship between a person and a corporation. Nonetheless, the court finds that Mr. Burford sufficiently dominated Burford, Inc.'s finances, policies and business practices at the time the relevant events occurred. *See First Health*, 585 So.2d at 1334.

Prior to the incorporation of Burford, Inc., Mr. Burford owned 96.62% of the outstanding Burford Equipment shares.[18] Now, as previously discussed, Mr. Burford owns all of the voting shares of Burford, Inc. which owns 100% of Burford Equipment's outstanding shares. He serves as Burford, Inc.'s president, CEO, and treasurer. The sole responsibility for management of both corporations rests with him; he transfers money between Burford Equipment and Burford, Inc. as he deems appropriate. Ms. Jackson testified that Mr. Burford is the sole repository of corporate authority and the sole arbiter of the distinction between Burford, Inc. and Burford Equipment.

Q: Does Mr. Burford act as the chief executive officer of Burford, Inc.?

A: As far as I know.

\* \* \* \* \* \*

Q: Ma'am, when you deal with Mr. Burford in the management of Burford, Inc. or

---

16. Indeed, there is nothing to stop Mr. Burford from deciding tomorrow that the $5 million which allegedly remains in Burford Equipment's bank account is not "needed" by Burford, Inc.

17. Because the court finds that Burford, Inc. is an alter ego of Mr. Burford, it does not discuss whether or not Mr. Burford might be liable as a plan fiduciary.

18. The remainder were owned by Mr. Hutson. *See* Burford II at 332–33.

in the management of Burford Equipment Company, how do you know what capacity he is speaking in or do you just accept what he says regardless of capacity?[19]

A: I know that he's president of the company and primary shareholder also.

Q: So when he tells you to do something whether it relates to Burford Equipment Company or it relates to Burford, Inc. it's just all treated as an instruction that will be followed?

A: He's my boss so I do what he tells me to do.

\* \* \* \* \* \*

Q: So when he tells you to do something, whether it relates to Burford Equipment Company or it relates to Burford, Inc. it's just all treated as an instruction that will be followed?

A: Yes.

Jackson Dep. at 110–11.

After this lawsuit was filed, Mr. Burford, as the officer of Burford, Inc., caused it to redeem his sister's stock for an undisclosed amount. Burford Dep. II at 16–18, 63–65. He professes ignorance of the origin of the money used to buy her shares, as well as the amount paid for them, although he implies that some of this money might have come from Burford Equipment. *See* Burford Dep. II at 18.

As noted above, it is impossible to apply strictly the twelve-factor test used above. However, the facts show that Mr. Burford did with Burford, Inc. and its assets whatever he wanted.[20] In short, the court finds that for all practical purposes, Mr. Burford was Burford, Inc.

Next, the court must consider whether such control was misused by Mr. Burford. It

appears that over the years, Mr. Burford used his control of Burford Equipment and Burford, Inc. to enrich himself at the expense of the corporations. He set his own salary, which was never reviewed by the board of directors. Burford Dep. II at 44. He would not state the amount he currently draws in salary, although it is admittedly less than the $161,500 he received six years ago. Burford Dep. II at 56–61. While that amount is not staggeringly large, it should be noted that Burford Equipment is in the winding up stage of corporate existence, and that Burford, Inc. currently operates a marina and store and Mr. Burford does not actively run either one.

Mr. Burford directed Burford Equipment to pay dividends (to him) when the company did not show a profit or when it had no cumulative earnings.[21] Plaintiffs' Ex. In the last few years, Burford Equipment has loaned corporate funds to shareholders (again, including Mr. Burford) when Burford Equipment was in need of cash. Plaintiffs' Ex. 109—Exhibit E, note 12. Burford Equipment routinely entered into contracts with companies in which Mr. Burford had an interest, in years when Burford Equipment lost money. Plaintiffs' Ex. 109—Exhibit E, note 10 (equipment leases with officers, including Mr. Burford); Ex. 110—Exhibit E, note 10 (same); Ex. 112, Exhibit E, note 9 (aircraft lease). Since the Burford Equipment pension plan was not funded, the money paid out to shareholders, officers and directors—Mr. Burford among them—was money that could not be used and cannot be used now to meet Burford Equipment's ERISA obligations.

As a matter of equity, the court finds that Mr. Burford should not be allowed to plan for his own retirement at the expense of his

**19.** Defendants' counsel objected to the form of this question.

**20.** The Seventh and Ninth Circuits look at the "amount of respect given to the separate identity of the corporation by its shareholders." *Lumpkin,* 933 F.2d at 461; *Board of Trustees v. Valley Cabinet & Mfg. Co.,* 877 F.2d 769, 772–73 (9th Cir.1989). This in turn is evidence by observation of corporate formalities, commingling of

funds, and transfer of funds to and from shareholders.

**21.** Alabama law prohibits the payment of so-called "nimble dividends"—dividends which are paid out of current earnings when the corporation shows no cumulative dividends. *See* Ala. Code § 10–2A–67 (1975 & Supp.1980).

former employees. In sum, the court finds that it should disregard the corporate structure and hold Mr. Burford liable for the debts incurred by Burford Equipment.[22]

Finally, the court notes that the parties have not yet determined the amount of damages, although they indicated at the pretrial hearing that their actuaries would compute the final amount due. Accordingly, the parties are DIRECTED to compute the damages so that the court can enter the appropriate judgment.

## JUDGMENT

In accordance with the attached memorandum opinion, it is CONSIDERED, ORDERED and ADJUDGED that Burford, Inc. and J. Lamar Burford, Jr. be and the same are hereby found to be liable for the judgments entered in this matter against Burford Equipment. The parties are DIRECTED to compute actuarially the final amount owed by the defendants.

---

**22.** The court has assumed throughout this discussion that Burford Equipment is technically insolvent; that it cannot afford to pay the judgment entered in this matter.